IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MARINE CLINE *on behalf of* G.E.C., | CASE NO. 1:23-cv-1087 |
| Plaintiff, | DISTRICT JUDGE JAMES S. GWIN |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Marine Cline, on behalf of G.E.C., filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In February 2021, Cline filed an application for Supplemental Security on behalf of her minor child, G.E.C., alleging a disability onset date of August 15, 2008,[1] and claiming that G.E.C. was disabled due to bipolar, oppositional

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 22, 425 (6th Cir. 2006).

defiant disorder, and attention deficit hyperactivity disorder. Tr. 170–71, 245.
The Social Security Administration denied Cline's application at the initial
level and on reconsideration. Tr. 69, 75. Cline then requested a hearing before
an Administrative Law Judge (ALJ). Tr. 92.

In March 2022, an ALJ held a hearing, at which Cline testified. Tr. 48–
62. That month, the ALJ issued a written decision finding that G.E.C. was not
disabled. Tr. 35–43. The ALJ's decision became final on April 17, 2023, when
the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20
C.F.R. § 404.981.

Cline filed this action on behalf of G.E.C. on May 31, 2023. Doc. 1. Cline
asserts the following assignment of error:

> The ALJ erred by failing to develop the record fully and fairly by issuing
> a decision that failed to explain his decision to require a medical expert's
> testimony at hearing but then instead issue a decision without the
> benefit of such expert testimony.

Doc. 9, at 2.

**Evidence**

*Personal and vocational evidence*

G.E.C. was born in 2006 and was 14 years old on the date Cline filed the
application. Tr. 36.

*Medical and education evidence*[2]

In 2011, G.E.C. was evaluated in school and didn't qualify for special

---

[2]    The recitation of the evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' briefs.

education services. Tr. 318. Testing showed that his overall cognitive ability was in the average range. Tr. 318.

In 2014 G.E.C. was re-evaluated and qualified as a "student with a Specific Learning Disability due to deficits in reading and writing." Tr. 318. Testing in 2017 showed that G.E.C.'s overall cognitive ability was in the low average range, but he no longer qualified for special services. Tr. 318. He received a "504 plan" to accommodate his inattention.[3] Tr. 318; *see also* Tr. 183. Testing in 2019 showed that G.E.C. had an average IQ score. Tr. 319.

A classroom observation in November 2019 found that G.E.C. worked well with others. Tr. 346. He paid attention to the lessons and stayed on task. Tr. 346. G.E.C. did "very well" in class when present, but his attendance was poor, which caused him to fall behind or get "lost" because he missed previously taught material. Tr. 346.

In October 2020, G.E.C.'s primary care provider reported that G.E.C.'s ADHD was "well-controlled since the last visit" with medication. Tr. 353.

A transcript from G.E.C.'s 2020–21 school year shows failing grades in most of the listed classes. Tr. 303.

At a counseling session in early March 2021, it was reported that G.E.C.'s impulsiveness had "calmed down a bit." Tr. 462. He hadn't gone to

---

[3]     The name "504 plan" comes from Section 504 of the Rehabilitation Act of 1973, which ensures that students with disabilities receive support services. *See, e.g.*, https://www.akronchildrens.org/kidshealth/en/parents/504-plans.html [https://perma.cc/58HB-V6EP].

school the week before the appointment. Tr. 462. His insight, judgment, and fund of knowledge were poor. Tr. 462. Later that month, G.E.C. told his counselor that family car problems affected his school attendance. Tr. 424. G.E.C. said that he was working on his missed assignments and was almost caught up. Tr. 424.

In May 2021, G.E.C. and Cline saw psychologist Jinhui Wang, Psy.D., for a video consultative exam. Tr. 472. G.E.C. was fourteen years, ten months old at the time. Tr. 472. In addition to the interview material, Dr. Wang had been provided with a pair of G.E.C.'s counseling records. Tr. 472. Cline told Dr. Wang that G.E.C. was currently in ninth grade on a 504 plan but that he was behind in all subjects. Tr. 473. His grades were Ds and Fs. Tr. 473. Teachers reported that G.E.C. didn't complete his work or ask for help. Tr. 473. G.E.C. explained he didn't understand some of the work that his teachers gave him. Tr. 473. He said that he had a good relationship with his teachers and didn't really speak to his peers. Tr. 473. He was given detention for taking too long on a bathroom break and suspended for getting into a fight on the school bus. Tr. 473. G.E.C. said that he had about ten friends at school. Tr. 473.

Cline stated that G.E.C. was taking Clonidine, Seroquel, Melatonin, and Adderall. Tr. 473. G.E.C. was diagnosed with ADHD in kindergarten and bipolar disorder in second or third grade. Tr. 473. He received individual counseling at school. Tr. 473. Cline and G.E.C. said that G.E.C.'s medications helped somewhat. Tr. 473. Cline reported that G.E.C. lashed out, yelled often,

4

and struggled a lot with schoolwork. Tr. 474. Things "ha[ve] to be his way or no way" and G.E.C. would also forget what he started. Tr. 474.

Dr. Wang remarked that when she interviewed G.E.C. alone, he was cooperative. Tr. 474. But when he was with Cline, he argued with Cline and was disrespectful. Tr. 474. G.E.C. appeared tired and yawned during the evaluation. Tr. 474. Dr. Wang wrote that G.E.C.'s speech and thought content were normal. Tr. 474. He had adequate eye contact. Tr. 474. He showed no abnormal behavior, confusion, or lack of awareness. Tr. 474. He tracked the conversation and didn't display issues with understanding or remembering questions. Tr. 474. G.E.C. had no attention and concentration impairment and he did not appear to be distracted. Tr. 475. His concentration and persistence "appeared satisfactory and he was able to remain on task and work at an adequate pace during the evaluation." Tr. 475. He spelled "world" correctly forwards but not backwards, successfully performed serial 3's, and could perform simple math equations. Tr. 475. Dr. Wang estimated G.E.C.'s intellectual functioning to be in the average range. Tr. 475. She observed no reasoning or judgment impairments. Tr. 475.

Based on her exam and G.E.C.'s counseling progress notes, Dr. Wang diagnosed G.E.C. with ADHD. Tr. 475.

In June 2021, G.E.C. had a counseling appointment and said that he was fixing four-wheelers with his father and brother. Tr. 499. He had to take summer classes. Tr. 498–99. In July, Cline reported that G.E.C. hadn't finished

the classes, so his "diversion was unsuccessful and he will need to go to court."
Tr. 498-499, 506.

An interim school progress record from March 2022 showed that G.E.C.
was failing all of his classes. Tr. 304. Teachers commented that G.E.C.'s
absences were affecting his work. Tr. 304.

*State agency opinions*[4]

In June 2021, David Dietz, Ph.D., reviewed G.E.C.'s records and found
that G.E.C. was not disabled Tr. 66–68. In September 2021, Cindy Matyi,
Ph.D., reviewed the updated file and agreed that G.E.C. was not disabled. Tr.
70–74. Dr. Matyi found that G.E.C. had no or less-than-marked limitations in
the six domains of functioning, described below. Tr. 72.

*Hearing testimony*

Cline, who along with G.E.C. was represented by counsel, testified at
the telephonic administrative hearing held in March 2022. Tr. 50–51. Cline
stated that she lived in a house with G.E.C. and G.E.C.'s brother. Tr. 53. She
said that G.E.C. was at that time in grade "nine-ten"—he was in tenth grade

---

[4]     When a claimant applies for disability benefits, the State Agency creates
a record. The record includes the claimant's medical evidence. A State Agency
disability examiner and a State Agency physician or psychologist review the
claimant's record and determine whether and to what extent the claimant's
condition affects his or her ability to work. If the State Agency denies the
claimant's application, the claimant can ask for reconsideration. On
reconsideration, the State Agency updates the record and a second disability
examiner and doctor review the file and make a new determination. *See, e.g.*,
20 C.F.R. § 404.1615.

but "still catching up from the ninth-grade work." Tr. 54. He had never had to repeat a grade or been held back. Tr. 54.

When asked why G.E.C. was disabled, Cline said that G.E.C. had mood swings and that anxiety prevents him from being around a lot of people. Tr. 54. He gets confused and has trouble concentrating when there is too much noise or too many people around. Tr. 54. He didn't sleep well. Tr. 54. He took medicine to sleep better, but the medicine regularly needed to be adjusted. Tr. 54. G.E.C. takes Adderall for ADHD every morning and had started taking it about a year before the hearing. Tr. 55. "Adderall is good, it works for him." Tr. 55. "Seroquel for … bipolar works good." Tr. 55. G.E.C. also goes to counseling. Tr. 55. He still has outbursts and trouble with school. Tr. 56.

When G.E.C. has an outburst, he screams and yells and slams things. Tr. 56. He doesn't damage things or hit people. Tr. 56. It takes 15 minutes or longer for him to calm down. Tr. 56. Cline stated that G.E.C.'s outbursts "[s]ometimes … happen[] every day," although she estimated that during the two weeks before the hearing, G.E.C. had three or four outbursts. Tr. 56–57. G.E.C.'s outbursts don't happen much at school, but he gets defiant at school sometimes with adults and has been suspended for insubordination. Tr. 57.

Academically, G.E.C. was doing "fair." Tr. 57. He got failing grades and struggled in math, reading, and English. Tr. 57. G.E.C.'s friend was going to school with him and helping G.E.C. try to get his grades up. Tr. 57. G.E.C. has

a 504 plan, so during tests he gets extra time, breaks, and stays in a small group. Tr. 57–58.

G.E.C. has a couple of friends at school. Tr. 58. He likes to play video games, ride his four-wheeler, and be outside. Tr. 59. Cline has to remind him to take out the trash and do his homework. Tr. 59–60. G.E.C. struggles with the homework material. Tr. 60. When asked about G.E.C.'s school attendance issues, Cline stated that the courts were now involved. Tr. 60. Dealing with G.E.C.'s attendance problems was a struggle, in part due to Cline's difficulty in getting G.E.C. and his brother, who is autistic and can't ride a bus, to school. Tr. 61. Also, the bus comes too early in the morning and neither of Cline's sons want to go to school. Tr. 61. But now G.E.C. and his brother know that they have to go to school under a court order and can't miss any more days. Tr. 61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant was born [i]n … 2006. Therefore, he was an adolescent on February 3, 2021, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).
>
> 2. The claimant has not engaged in substantial gainful activity since February 3, 2021, the application date (20 CFR 416.924(b) and 416.971 et seq.).
>
> 3. The claimant has the following severe impairments: depressive disorder; and attention deficit hyperactivity disorder (ADHD) (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since February 3, 2021, the date the application was filed (20 CFR 416.924(a)).

Tr. 36–43.

**Standard for Disability**

A child claimant, under the age of 18, is entitled to receive Supplemental Security Income benefits if the claimant establishes the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

An ALJ is required to follow a three-step sequential analysis to make a disability determination for a child claimant:

1. Is the claimant engaged in any substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment that is "severe"? If not, the claimant is not disabled.

9

> 3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the claimant is not disabled.

20 C.F.R. § 416.924(a)–(d).

To determine under step three whether a claimant's impairment functionally equals a listing, the ALJ considers six domains of functioning: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) "[c]aring for yourself"; and (6) "[h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)–(vi); *see Smoot v. Comm'r of Soc. Sec.*, No. 5:22-cv-1235, 2023 WL 1413097, at *12 (N.D. Ohio Jan. 31, 2023); *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 855 (E.D. Mich. 2012) (citing 20 C.F.R. § 416.926a). To establish a functional impairment equal to the listings, the claimant must show an "extreme" limitation in one domain or a "marked" impairment in more than one domain. 20 C.F.R. § 416.926a(d). As in any Social Security disability case, the child claimant has the burden of proof at steps one through three. 20 C.F.R. § 416.912(a); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

At the beginning of the administrative hearing, the ALJ identified the participants, including counsel for Cline and G.E.C., and then stated, "[w]e did

11

have a medical expert scheduled, but he could not attend the hearing today." Tr. 51. The ALJ proceeded with the hearing, Tr. 51–62, and didn't explain at the hearing or in his decision why he proceeded without the medical expert's presence or input. Cline alleges that the ALJ's "failure to seek the expert opinion or in the alternative, to explain[] why it was no longer necessary, is erroneous." Doc. 9, at 7.

Cline's argument is based on a faulty premise—that the ALJ deemed that a medical expert was "necessary." Because Cline doesn't show that a medical expert was necessary, the ALJ could not have erred when he failed to consult one before rendering his decision or explain why he didn't consult one.

In her opening brief, Cline argues that the ALJ must follow the Agency's "own regulations" and failed to do so here. Doc. 9, at 11. Cline doesn't cite any regulations about medical experts that the ALJ violated—she only cites the Agency's "own internal policies on the use of medical experts" found in HALLEX.[5] Doc. 9, at 8–9. But HALLEX "is not published in either the Federal Register or the Code of [Federal] Regulations[ ] and does not have the force of law." *Alilovic v. Astrue*, No. 1:12-cv-323, 2012 WL 5611077, at *7 (N.D. Ohio Nov. 15, 2012). So, as Cline concedes,  Doc. 12, at 2, it's not binding on this Court, although it can be persuasive. *See Bowie v. Comm'r of Soc. Sec.*, 539

---

[5]     HALLEX stands for Hearings, Appeals and Litigation Law Manual of the Social Security Administration.

F.3d 395, 399 (6th Cir. 2008); *see Bryant v. Comm'r of Soc. Sec. Admin.*, No.

1:12-cv-2122, 2013 WL 5406674, at *5 (N.D. Ohio Sept. 25, 2013).

The HALLEX provision that Cline cites is not persuasive evidence that

the ALJ erred. According to HALLEX I-2-5-34, *When to Obtain Medical Expert*

*Opinion*, an ALJ *must* obtain a medical expert when:

> • The Appeals Council or Federal court ordered an
> M[edical] E[xpert] opinion.
>
> • There is a question about the accuracy of medical
> test results reported, requiring evaluation of
> background medical test data…
>
> • The ALJ is considering finding that the claimant's
> impairment(s) medically equals a listing.[6]

HALLEX I-2-5-34 (A)(1), 1994 WL 637370 (last updated Jan. 21, 2020). And

HALLEX I-2-5-34 (A)(2) lists eleven scenarios in which an ALJ *has the*

*discretion* to obtain a medical expert opinion.[7] *Id.*

---

[6]     The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

[7]     The eleven scenarios are: whether a claimant's impairments meet a listed impairment; the usual dosage and effect of drugs and other forms of therapy; a claimant's failure to follow prescribed treatment; when a claimant's drug addiction or alcoholism may be material to the disability decision; the degree of severity of a claimant's physical or mental impairment; to suggest additional relevant evidence because there is reasonable doubt about the adequacy of the medical record; to clarify and explain the evidence or help resolve a conflict in contradictory, inconsistent, or confusing medical evidence; to explain and assess the significance of unclear clinical or laboratory findings; to opine about the claimant's functional limitations and abilities; when there

Cline doesn't identify which of the three situations detailed above apply to this case such that the ALJ was *required* to obtain a medical expert. Neither the Appeals Council nor a Federal court ordered a medical expert. Cline hasn't identified a medical or other test result in which the accuracy of the report could be questioned. She hasn't shown—or even alleged—that the ALJ considered finding that G.E.C.'s impairments medically equaled a listing.[8] Moreover, Cline hasn't alleged any error in the ALJ's factual determination that G.E.C. did not meet or equal a listed impairment. So she hasn't shown that the ALJ was *required* to obtain a medical expert in this case, even under the persuasive authority of HALLEX, and the ALJ's failure to do so could not have been an error.

Throughout her briefs, Cline states that the ALJ determined that a medical expert was "necessary." *See* Doc. 9, at 7, 9, 11; Doc. 12, at 2, 3. In support of this characterization, Cline cites "the publication of the expert's

---

is a question about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time; and to determine the onset of an impairment. *See* HALLEX I-2-5-34 (A)(2), 1994 WL 637370.

[8]     As noted, Cline hasn't alleged that this third scenario applies to this case. Nor could she. The third scenario "does not apply when an ALJ concludes that a claimant *did not* meet a listing. Rather, it applies only when an ALJ wants to conclude that a claimant's impairments *did* equal a listing." *Schildwachter v. Berryhill*, No. 17-cv-7277, 2019 WL 1116256, at *7 (S.D.N.Y. Feb. 8, 2019) (internal citations omitted), *report and recommendation adopted*, 2019 WL 1115026 (S.D.N.Y. Mar. 11, 2019). Indeed, if this scenario were interpreted otherwise, the ALJ would be required to obtain a medical expert in every case involving at least one severe impairment. *See, e.g., Dubois v. Berryhill*, No. 1:17-cv-0076, 2017 WL 6000340, at *3, (D. Me. Dec. 3, 2017).

curriculum vitae" in the transcript and the "ALJ's own statement at the hearing: [w]e did have a medical expert scheduled, but he could not attend the hearing today." Doc. 9, at 9 (citing Tr. 51, 479–80). The fact that the medical expert's curriculum vitae is in the transcript doesn't show that the ALJ deemed the expert's testimony to be necessary. In fact, HALLEX 1-2-3-15, *Notice of Hearing*, states that an ALJ must notify the claimant when a medical expert will testify at the hearing. 1993 WL 642999 (last updated Jan. 21, 2020). This is what happened here. *See* Tr. 144 (Agency's notice to Cline that a medical expert will appear telephonically at the hearing). And because HALLEX instructs that an ALJ may not consult a medical expert who has treated or examined the claimant, *see* HALLEX 1-2-5-32 (C), *Medical experts—General*, 1994 WL 637369 (last updated Aug. 29, 2014), it is logical for an ALJ to include in the transcript medical experts' curriculum vitae so that claimants can advise the ALJ in advance if the expert treated or examined them.

Neither does the ALJ's statement—"[w]e did have a medical expert scheduled, but he could not attend the hearing today," Tr. 51—indicate that the ALJ deemed the expert's testimony to be necessary. As explained above, an ALJ has the *discretion* to obtain a medical expert for numerous reasons. Moreover, counsel for Cline and G.E.C. did not object to the ALJ proceeding with the hearing despite the medical expert's absence, *see* Tr. 51, or request that the ALJ follow up with interrogatories to a medical expert. *See* HALLEX I-2-5-34 (A)(2), 1994 WL 637370 (an ALJ may obtain a medical expert opinion

through hearing testimony or through written interrogatories); *see also Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *13 (N.D. Ohio Feb. 13, 2019) (finding that the ALJ's decision was supported by substantial evidence and that, "[m]oreover, Owens, who was represented by counsel at the hearing, did not request a consultative examination or otherwise suggest the medical record was insufficient for the ALJ to make a disability determination"), *report and recommendation adopted*, 2019 WL 1929695, at *3 (N.D. Ohio Apr. 30, 2019) (the ALJ "is not responsible for counsel's failure to supplement the record simply because, in retrospect, it might have been wise for counsel to do so").

Cline contends that the ALJ "had limited evidence before him." Doc. 9, at 10. Cline cites her testimony and function reports, the consultative examiner's opinion, G.E.C.'s counseling records, G.E.C.'s school records, and the state agency reviewers' opinions. *Id*. Cline doesn't explain what about this evidence she believes is lacking or how it equates to ALJ error. She suggests that there is a "lack of reliable functional opinion evidence" that "drove the ALJ to seek the expert opinion a medical expert's testimony would have provided at [the] hearing." *Id*. at 11. But the only alleged deficiency in the opinion evidence that Cline identifies is the fact that the state agency reviewers' opinions were based on an incomplete record. Doc. 9 at 10 (citing G.E.C.'s school records and counseling notes from March 2021 to January 2022). Cline's argument is meritless because "there is always some time lapse between the consultant's report and the ALJ hearing and decision," *Jones v.*

*Colvin*, No. 5:13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014), and so long as the ALJ considered the subsequent evidence and "took into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance upon the state agency reviewers' opinions, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, the ALJ considered the later-supplied school records, Tr. 41–43, and G.E.C.'s then-recent counseling records, Tr. 41–42. So there was no per se insufficient opinion evidence and no error. *See McGrew*, 343 F. App'x at 32.

Moreover, even if there was a "lack of reliable functional opinion evidence," as Cline alleges, that circumstance describes a *discretionary* reason for an ALJ to obtain a medical expert, not a required reason. *See* HALLEX I-2-5-34 (A)(2), 1994 WL 637370 ("An ALJ *may* obtain" a medical expert's opinion when the expert "may be able to suggest additional relevant evidence because there is reasonable doubt about the adequacy of the medical record") (emphasis added).

Cline also argues that the ALJ violated his duty to fully develop the record. Doc. 9, at 7, 12. While an ALJ must ensure that every claimant receives a "full and fair hearing," the ultimate burden of proving entitlement to benefits lies with the claimant. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); 20 C.F.R. § 404.1512(a)). Although social security proceedings are inquisitorial rather than adversarial, that doesn't mean that the ALJ advocates for the claimant.

17

*See Moats*, 42 F.4th at 563 ("Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate.") (citing *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion). It is only under "extreme circumstances"—not present here—that the ALJ could be said to have a "special duty" to help develop the record.[9] *See Moats*, 42 F.4th at 563–64 (discussing *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

Apart from arguing that the ALJ should have consulted a medical expert, Cline doesn't identify where she believes the ALJ went wrong in developing G.E.C.'s record. And whether the ALJ should have consulted a medical expert brings one back to whether the ALJ was *required* to. But Cline hasn't shown that the ALJ was required to consult a medical expert, so she hasn't show that the ALJ failed in his duty to develop the record by not doing so.[10] *See Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (finding that the ALJ did not fail to provide the claimant with a full and

---

[9]    In *Lashley*, the claimant wasn't represented by counsel and only had a fifth-grade education. 708 F.2d at 150–52. A series of strokes left Lashley unable to articulate his thoughts and impaired his ability to read. *Id*. Here, Cline and G.E.C. were represented by counsel and there is no indication that Cline had difficulty testifying about her child's conditions.

[10]    Again, counsel did not object when the ALJ proceeded with the hearing after stating that the medical expert would not be present. Tr. 51. *See Owens*, 2019 WL 2465229, at *13 ("Owens, who was represented by counsel at the hearing, did not request a consultative examination or otherwise suggest the medical record was insufficient for the ALJ to make a disability determination").

fair hearing by declining to order a consultative exam, because the claimant has the burden of proving disability and the regulations permit, but don't require, an ALJ to order a consultative exam); *see also* 20 C.F.R. § 416.920b(b) & (b)(2)(iv) ("In some situations, we may not be able to make our determination or decision because the evidence in your case record is insufficient or inconsistent…. If the evidence in your case record is insufficient or inconsistent, we *may* need to take the additional actions [below]," including that "we *may* ask you or others for more information") (emphasis added).

Finally, Cline submits that "[i]t is not comprehensible why or how the ALJ made his determination to issue a decision without the testimony of a medical expert" and the ALJ's failure to explain this "does 'not build an accurate and logical bridge between the evidence and the result.'" Doc. 9, at 12. (citing *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (in turn quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). But the ALJ in his decision went through each of the required steps when evaluating G.E.C.'s disability application and explained his reasons for his findings, citing evidence in the record. Tr. 37–43. Cline doesn't challenge the ALJ's factual findings. Other than her baseless complaint about the state agency reviewers' opinions, Doc. 9 at 10, Cline doesn't challenge the ALJ's adherence to applicable legal standards. The only explanatory failure that Cline identifies is the ALJ's failure to explain why he didn't consult with a medical expert with whom he was not required to consult. Because the ALJ wasn't required to

consult with a medical expert, he wasn't required to explain his reasons for not doing so. Moreover, even if it could be said that the ALJ erred in failing to consult with a medical expert, Cline hasn't shown that G.E.C. satisfies the listing requirements, which is her burden, so any purported error is harmless. *See, e.g., Balknight v. Comm'r of Soc. Sec.*, No. 18-cv-11843, 2019 WL 4011881, at *25, n.17 (E.D. Mich. July 31, 2019) ("the burden at step three remains on the plaintiff and, consequently, the ALJ's failure to consult experts about equivalence had been held irrelevant when the plaintiff failed to meet the burden") (citing cases), *report and recommendation adopted*, 2019 WL 3997146 (E.D. Mich. Aug. 23, 2019).

In short, the ALJ applied the correct legal standards and his factual findings are supported by substantial evidence in the record. *See Jordan*, 548 F.3d at 422. So the ALJ's decision should be affirmed.

### Conclusion

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: December 12, 2023

                               */s/ James E. Grimes Jr.*
                                James E. Grimes Jr.
                                U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).